937 F.2d 26
 Michael J. KINGSLEY, Plaintiff-Appellant,
v.
BUREAU OF PRISONS, Michael Quinlan, Director, Jesse James,
Warden, F.C.I. Otisville, and Mark Myers,
Lieutenant, F.C.I. Otisville,
Defendants-Appellees.
 No. 518, Docket 89-2399.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 7, 1991.
Decided June 24, 1991.
 
 Charles E.F. Millard, Jr., New York City (Davis Polk & Wardwell, Ogden N. Lewis, of counsel), for plaintiff-appellant.
 Thomas A. Zaccaro, Asst. U.S. Atty., S.D.N.Y., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Edward T. Ferguson, III, Asst. U.S. Atty., of counsel), for defendants-appellees.
 Before LUMBARD, NEWMAN and ALTIMARI, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 Michael J. Kingsley, a federal prisoner, formerly an inmate at the Federal Correctional Institution ("FCI") at Otisville, New York, appeals the July 27, 1989, order of the Southern District of New York, Louis L. Stanton, Judge, dismissing his pro se complaint, which the court construed as a petition for a writ of habeas corpus and as a claim for damages under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Kingsley alleges that his constitutional rights were violated during a random prison drug test and in subsequent disciplinary proceedings that occurred because he allegedly refused to provide a urine sample within two hours, in violation of 28 C.F.R. Sec. 550.30(c) (1990).[1]
 
 
 2
 We conclude that Kingsley was denied his right to call witnesses in his disciplinary hearing and, therefore, we reverse the dismissal of his petition for a writ of habeas corpus. The district court is directed to order defendant Jesse James, Warden of FCI Otisville, to reinstate the 15 days of "good time"[2] revoked in the disciplinary proceedings and to expunge the offense from Kingsley's record, unless a new hearing is held at which Kingsley is permitted to call witnesses. We affirm the district court's dismissal of Kingsley's Bivens action, as the facts alleged do not constitute cruel and unusual punishment.
 
 BACKGROUND
 
 3
 Kingsley, an inmate at FCI Otisville, spent the evening of July 18, 1987 exercising. He had run five miles, showered, and urinated, but did not drink any fluids. At approximately 8:00 p.m., prison officials told Kingsley that he was to be part of a random prison drug test, and that he would have to provide a urine sample within the next two hours. Kingsley had never participated in a prison drug test before.
 
 
 4
 Kingsley, along with thirty-six other inmates, was escorted to the lieutenants' office, where he was asked to provide a urine sample. Kingsley told the officer who monitored the test, Lieutenant Mark Myers, that he was nervous and could not urinate when anyone was watching. Myers informed Kingsley that he would be subject to sanctions if he refused to supply a specimen.
 
 
 5
 When Kingsley was unable to provide a sample in his first attempt, Myers gave him two cups of water to drink. At approximately 8:20 p.m. and 8:40 p.m., Kingsley again attempted to urinate into a specimen bottle, but was unsuccessful. Each of the three attempts was made in the lieutenants' office bathroom, with Kingsley under Myers' direct supervision. During each of the attempts, Kingsley requested permission to leave the sink faucet turned on. Kingsley stated that the sound of running water might help him urinate. Kingsley also alternated letting warm and then cold water run over his left wrist while he attempted to urinate. At approximately 8:55 p.m., Kingsley made another unsuccessful attempt to produce a specimen.
 
 
 6
 At about 9:00 p.m., Kingsley and six other inmates, who also had not provided urine samples, were taken by Myers to the Special Housing Unit ("SHU") for an official inmate count. An hour later, the inmates were returned to the lieutenants' office to try again. The other inmates provided a specimen at that time, but Kingsley did not.
 
 
 7
 At about 10:30 p.m., in the presence of a third individual, Officer Atwood, Myers gave Kingsley a cup of ice and told him to apply it to his testicles. Kingsley contends that he was ordered to apply the ice to himself; according to Myers, it was merely a suggestion. Kingsley states that he did not know whether Myers was trying to help or hurt him but, nevertheless, he complied with the instruction. Although Kingsley believed that the application of ice would not hurt, he claims that it did. Kingsley was unsuccessful in his subsequent attempts to provide a urine specimen. At approximately midnight, Kingsley was taken to disciplinary segregation.
 
 
 8
 Myers then instructed SHU Officer Crowell to prepare an incident report charging Kingsley with refusing to provide a urine sample. Crowell's report stated: "At 8:40PM Inmate Kingsley, Michael # 15423-038 was brought into Segregation for a urine sample. At 12:00 AM Inmate Kingsley still had not provided a urine sample."
 
 
 9
 On July 19, the incident report was investigated by Lieutenant Keith, who determined: "Inmate Kingsley [sic] attitude was good. Inmate Kingsley stated that the incident report is true as written. No other statement was made." Keith concluded that the incident report was warranted and forwarded the report to the prison unit disciplinary committee.
 
 
 10
 That same day, Kingsley appeared before the unit disciplinary committee. The committee recorded Kingsley's comments to it as follows: "States that he could not Urine [sic] for the Lt. Incident true as stated." The committee referred the charge to the disciplinary hearing officer ("DHO") for hearing and disposition.
 
 
 11
 At the July 21 disciplinary hearing, Kingsley explicitly requested that witnesses be called on his behalf. He specified that he wished to call "who ever was one [sic] line the night of the test." Kingsley did not know the names of these persons; when the random drug test was conducted, Kingsley had only been at FCI Otisville for five days. Prison officials had a list of the 36 inmates, which indicated those seven inmates who, along with Kingsley, had not initially provided urine samples. Nevertheless, the DHO found that Kingsley waived his right to call witnesses because he could not identify them by name.
 
 
 12
 The DHO's report summarizes Kingsley's statement at the July 21 hearing as follows:
 
 
 13
 I did not refuse to give a urine sample, I was unable to. I called the officer in the morning and told him I could give him a sample then but he didn't want it anymore. This is the first time I ever had to provide a sample and I was nervous and couldn't urinate at that time. I am clean, I would have given a sample if I could. They gave me more than the 2 hour time limit and also gave me two (2) cups of water.
 
 
 14
 No other witnesses testified at the hearing. Considering only Kingsley's testimony, the incident report and investigation, the DHO found that the act was committed as charged. The DHO set forth the following as "specific evidence to support [his] findings":
 
 
 15
 On July 18, 1987 at 12:00 midnight, you were issued an incident report for failing to provide a urine sample required by Bureau policy. Officer Crowell, Special Housing Unit Senior Officer Specialist, issued the incident report relating that you had entered Segregation at 8:40 p.m. for the purpose of obtaining the urine specimen, and as of 12:00 midnight, you had not provided the required sample.
 
 
 16
 Throughout the disciplinary process you freely admitted that you did not provide the sample, justifying your actions as being unable to urinate. Although not revealed in the investigation of this report, you were freely advised [sic] that you were given the opportunity to consume two (2) cups of fluid, and given more than two (2) hours to provide your sample. A review of the time element revealed that you were given more than ample opportunity, specifically, 3 hours and 40 minutes, to provide the sample.
 
 
 17
 Your inability to provide a urine sample is not justified by any medical documentation or evidence submitted during this hearing; therefore, you are guilty of Code 110.[3]
 
 
 18
 In addition to placing a "Code 110" on Kingsley's record, the DHO sanctioned him with 15 days disciplinary segregation and the loss of 15 days statutory good time. The DHO set forth the following reason for the disciplinary action:
 
 
 19
 The Federal Prison System initiated a Urinalysis Surveillance Program in order to identify inmates utilizing unauthorized narcotics, medication and marijuana. A review of all procedures surrounding the incident reveals that staff followed the guidelines as established by policy. Your refusal or inability to provide a urine sample cannot be condoned, therefore, the above sanctions have been imposed. Hopefully the next request for a urine specimen will be accomplished within the required time limit, and this type of incident will not occur in the future.
 
 
 20
 Because of the July 18 incident, Kingsley was placed in the high risk test group of the urine surveillance program and was required to provide urine specimens for six consecutive months. See 28 C.F.R. Sec. 550.30(a). Kingsley did so, each time testing negative for illegal substances. He was removed from the high risk group on February 1, 1988. Since that time, Kingsley's difficulty in providing urine specimens has been documented by Lynn Calcote, a chief prison psychologist. Calcote states that Kingsley's anxiety is not unusual. She recommends that Kingsley be given more time than the two hours suggested in the prison guidelines or be permitted to use a "dry cell" to allow him to provide a sample in private, but without the risk of dilution.
 
 
 21
 After the disciplinary hearing, Kingsley filed a Request for Administrative Remedy with the Bureau of Prisons. On September 15, 1987, this appeal was denied. On October 5, Kingsley filed a Central Office Appeal, to which he received no response.
 
 
 22
 On June 7, 1988, Kingsley filed a pro se complaint under 42 U.S.C. Sec. 1983 (1988) against defendants Bureau of Prisons; Michael Quinlan, director of the Bureau of Prisons; Jesse James, warden of FCI Otisville; and Mark Myers, the officer who supervised the random drug test. In the complaint, Kingsley seeks to have his good time credits restored, his record expunged, and to obtain damages for the pain inflicted by the application of ice to his testicles.
 
 
 23
 On February 10, 1989, defendants moved the district court for judgment on the pleadings, see Fed.R.Civ.P. 12(c), or, in the alternative, summary judgment, see Fed.R.Civ.P. 56.
 
 
 24
 In a July 27 opinion and order, the district court granted defendants' motion. The district court first ruled that although Sec. 1983 does not give rise to a cause of action against federal officials,[4] the court would consider Kingsley's claims as a petition for a writ of habeas corpus, pursuant to 28 U.S.C. Sec. 2255 (1988),[5] and as a Bivens claim. The court then determined that Kingsley's complaint did not show that his constitutional rights were violated during the drug test or in the subsequent disciplinary hearing, and that, therefore, Kingsley was not entitled to relief.
 
 DISCUSSION
 
 25
 Kingsley contends that the DHO improperly determined that he waived his right to call witnesses because he could not identify them by name. He argues that this violated the Bureau of Prisons' regulations and warrants the reversal of the district court's denial of his petition for a writ of habeas corpus. We agree.
 
 
 26
 By regulation,
 
 
 27
 An inmate has the right to submit names of requested witnesses and have them called to testify and to present documents on the inmate's behalf, provided the calling of witnesses or the disclosure of documentary evidence does not jeopardize or threaten institutional or an individual's security. The DHO shall call those witnesses who have information directly relevant to the charge(s) and who are reasonably available.
 
 
 28
 28 C.F.R. Sec. 541.17(c) (1990). This regulation implements protection of a liberty interest in the statutory good time credits that cannot be taken from him in a prison disciplinary hearing without due process of law. See Ponte v. Real, 471 U.S. 491, 495, 105 S.Ct. 2192, 2195, 85 L.Ed.2d 553 (1985). These due process safeguards include the right to call and present witnesses in his defense. Id. (citing Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)).
 
 
 29
 The right to call witnesses is circumscribed, however, "by the penological need to provide swift discipline in individual cases" and "by the very real dangers in prison life which may result from violence or intimidation directed at either other inmates or staff." Id. It is subject to the "mutual accommodation between institutional needs and objectives and the provisions of the Constitution...." Id. (quoting Baxter v. Palmigiano, 425 U.S. 308, 321, 96 S.Ct. 1551, 1559, 47 L.Ed.2d 810 (1976) (citing Wolff, 418 U.S. at 556, 94 S.Ct. at 2975)). "Thus the prisoner's right to call witnesses and present evidence in disciplinary hearings could be denied if granting the request would be 'unduly hazardous to institutional safety or correctional goals.' " Id. (citations omitted). The Supreme Court also has suggested that a prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity. See id., 471 U.S. at 496, 105 S.Ct. at 2195 (quoting Wolff, 418 U.S. at 566, 94 S.Ct. at 2979). The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of the position. See id., 471 U.S. at 499, 105 S.Ct. at 2197.
 
 
 30
 The DHO deemed Kingsley's request for witnesses waived solely because Kingsley could not identify the other prisoners by name. In the circumstances of this case, this was an arbitrary application of the regulation assuring that witnesses may be called. The presumption that an inmate is unwilling to provide a urine specimen if he fails to do so within two hours creates a special evidentiary problem unlikely to occur in most hearings concerning prison discipline. Though prison officials can normally insist that a prisoner identify the names of his prospective witnesses, it was arbitrary to insist on this requirement here where the need for the witnesses was especially compelling, their identities were readily available to the prison officials,[6] and Kingsley's inability to identify them by name was understandable in view of his arrival at the prison only five days earlier. Fulfilling Kingsley's request would not have delayed the imposition of "swift discipline," and no other institutional objective was implicated. In these circumstances, it was an arbitrary application of the regulation to deem Kingsley to have waived his right to call witnesses.
 
 
 31
 The district court concluded that Kingsley's request for witnesses was properly denied because the testimony was neither relevant nor probative of any contested issue. The court noted that Kingsley told the DHO that the witnesses could have attested to his nervousness. The DHO replied that because he was sure Kingsley was nervous during the test, there was no reason to call the witnesses.
 
 
 32
 We disagree with the district court. The testimony would have been probative of Kingsley's willingness to provide a urine sample. Although the DHO conceded that Kingsley was nervous, Kingsley's fellow inmates could have attested to the extent of his nervousness, his overall demeanor, and to any comments he made during the test. Unless the DHO determined that Kingsley's testimony itself was sufficient to rebut the presumption of unwillingness, further testimony regarding his emotional state would have supported his claimed inability to urinate.
 
 
 33
 Accordingly, we conclude that Kingsley was denied his right to call witnesses in his disciplinary hearing and reverse the dismissal of Kingsley's habeas petition. We remand the action and direct the district court to order that the penalties imposed on Kingsley as a result of the disciplinary hearing be expunged from his record, unless a new hearing is held at which Kingsley is allowed to call witnesses.
 
 
 34
 Next, we address Kingsley's contention that the order that he apply ice to his testicles constituted cruel and unusual punishment and that, therefore, the district court erred in dismissing his claim for damages under Bivens.
 
 
 35
 In a Bivens action, "damages may be obtained for injuries consequent upon a violation of [the Constitution] by federal officials." 403 U.S. at 395, 91 S.Ct. at 2004. Alleged prison brutality is "part of the total punishment to which the individual is being subjected for his crime and, as such, is a proper subject for Eighth Amendment scrutiny." Ingraham v. Wright, 430 U.S. 651, 669, 97 S.Ct. 1401, 1411, 51 L.Ed.2d 711 (1977). However, "[a]fter incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Id. at 670, 97 S.Ct. at 1412. Further,
 
 
 36
 To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety.... It is obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited by [the eighth amendment].
 
 
 37
 Whitley v. Albers, 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (affirming dismissal of a habeas claim asserted by a prisoner who was shot by prison officials who were attempting to quell a riot). Although there are no reported Bivens actions that allege facts similar to this case, courts have recognized that embarrassment and pain without penological justification can constitute an eighth amendment violation. See Corselli v. Coughlin, 842 F.2d 23, 27 (2d Cir.1988) (reversing district court's grant of summary judgment in favor of defendants in prisoner's civil rights claim where plaintiff alleged that deliberate three-month exposure to bitter cold in cell block constituted cruel and unusual punishment); Kent v. Johnson, 821 F.2d 1220, 1227-28 (6th Cir.1987) (reversing district court's dismissal of eighth amendment claim in prisoner's civil rights action, where prisoner had repeatedly been forced to shower in presence of female guards).
 
 
 38
 Although there seems to be no medical justification for Myers' order and the momentary application of ice to Kingsley's testicles may have hindered, rather than helped, his ability to urinate, the order does not evince the obduracy and wantonness that characterizes conduct proscribed by the eighth amendment. Though we question whether prison officials, lacking medical training, should suggest their own notions about techniques to facilitate bodily functions, we cannot say that what occurred here amounted to cruel and unusual punishment. No harm was inflicted, and Kingsley's allegation, at most, indicates minor and fleeting pain. Under the circumstances alleged, Kingsley was not subjected to cruel and unusual punishment; we affirm the district court's dismissal of Kingsley's Bivens claim.
 
 
 39
 Affirmed in part; reversed in part.
 
 
 
 [1]
 By regulation, staffs of federal correctional institutions are directed to conduct monthly random drug tests of their inmate populations. See 28 C.F.R. Secs. 500.1, 550.30 (1990). Kingsley was disciplined pursuant to 28 C.F.R. Sec. 550.30(c), which provides, in relevant part:
 If an inmate is unwilling to provide a urine sample within two hours of a request for it, staff shall file an incident report.... An inmate is presumed to be unwilling if the inmate fails to provide a urine sample within the allotted time period. An inmate may rebut this presumption during the disciplinary process.
 
 
 [2]
 By statute, prisoners who faithfully observe all rules and have not been subject to punishment are entitled to good time allowances, which are deductions from their term of sentence. See 18 U.S.C. Sec. 4161 (1988)
 
 
 [3]
 Infraction Code 110 is "Refusing to Provide a Urine Sample." It is a Series 100 offense, which is the most serious category in the Bureau of Prison's custody classification. Any such "Greatest" offense affects an inmate's custody scoring for 10 years. The custody scoring is used to determine an inmate's eligibility for furloughs and half-way house stays
 
 
 [4]
 As the district court found, a prerequisite for relief under Sec. 1983, which concerns the deprivation of rights, privileges, and immunities secured by the Constitution and federal laws, is that the defendant acted under color of state law. See Graseck v. Mauceri, 582 F.2d 203, 207 (2d Cir.1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 91 (1979). An action brought pursuant to 42 U.S.C. Sec. 1983 cannot lie against federal officers. See Chodos v. Federal Bureau of Investigation, 559 F.Supp. 69, 72 (S.D.N.Y. 1982) aff'd, 697 F.2d 289 (2d Cir.1982), cert. denied, 459 U.S. 1111, 103 S.Ct. 741, 74 L.Ed.2d 962 (1983); see also Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 456 F.2d 1339, 1346 (2d Cir.1972) (on remand)
 
 
 [5]
 We note that challenges to the length, appropriateness or conditions of confinement are properly brought under 28 U.S.C. Sec. 2241 (1988). Under Sec. 2255, prisoners can move the sentencing court to vacate, set aside, or correct the initial sentence
 
 
 [6]
 The prison officials could have provided Kingsley with the names of the 36 other inmates who took part in the test or, at least, the names of the six persons who were similarly unable to provide urine specimens in their first attempt. Kingsley then could have determined whether any of these other prisoners could offer evidence in his defense. Two of these prisoners did submit affidavits on Kingsley's behalf in the district court proceeding