Kevin RICHARDSON, Plaintiff,

v.

Capt. VAN DUSEN; Sgt. McKernon; C.O. Huff; C.O. Martuscello; C.O. Finn; and C.O. Baldwin, Defendants.

No. 84–CV–325.

United States District Court, N.D. New York.

Sept. 20, 1993.

Kevin Richardson, pro se.

Smyk, Smyk, & Fahrenz, Binghamton, NY (Joseph F. Cawley, of counsel), for plaintiff.

Robert Abrams, Atty. Gen. of State of N.Y., Albany, NY (David B. Roberts, Asst. Atty. Gen., of counsel), for defendants.

## MEMORANDUM–DECISION and ORDER

McAVOY, Chief Judge.

New York State prison inmate Kevin Richardson brought this action pursuant to 42 U.S.C. § 1983 against defendant correction officers seeking compensation for damages arising out of events which occurred on May 31, 1982 at Coxsackie Correctional Facility and the resultant Superintendent's Hearing held on June 4 and June 7, 1982. Plaintiff alleges that on May 31, 1982 he was subjected to excessive force during an altercation with prison guards and then denied timely medical attention for the injuries he suffered, both in violation of his rights secured by the Eighth Amendment. Richardson also alleges that during a disciplinary hearing held June 4 & 7, 1982, he was denied due process in violation of his rights secured by the Fourteenth Amendment.

The matter was tried to the bench in Binghamton, N.Y. on May 25 and 26, 1993. The following constitutes the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52.

## I. FINDINGS OF FACT

Between April 17, 1982 and April 25, 1982, approximately twenty inmates were transferred from the Great Meadow Correctional Facility ("Great Meadow") to the Coxsackie Correctional Facility ("Coxsackie"). This transfer followed a prisoner uprising at Great Meadow in which an inmate named "Butch" Harvey was killed. It was plaintiff's contention at trial that Harvey's death was attributable to staff officers at the Great Meadow facility. It was plaintiff's further contention at trial that the altercation between himself and the defendants at Coxsackie was in retribution for his willful participation in the investigation into Harvey's death.

The facts of the case show that plaintiff was transferred from Great Meadow to Coxsackie on April 25, 1982, shortly after the uprising at Great Meadow which resulted in Harvey's death. The facts also show that plaintiff was placed in the Special Housing Unit (SHU) upon arrival at Coxsackie. While most of the inmates transferred with plaintiff from Great Meadow to Coxsackie were also confined to SHU, those inmates were so confined for purposes of protective

segregation. Plaintiff, on the other hand, was placed in SHU because he had been sentenced in 1981, while at Great Meadow, to two years in SHU with loss of privileges following an earlier Superintendent's Hearing wherein he was found guilty of manslaughter in relation to the stabbing death of another inmate.

It should be noted that the finding of the Great Meadow Superintendent's Hearing was later expunged by court order. However, it is important to note that this order was not issued until September of 1983, sixteen months after the incident at issue in this case. This is significant with regard to plaintiff's due process claim and in understanding plaintiff's status as a SHU detainee when judgment was passed upon him at the June, 1982 Superintendent's Hearing at Coxsackie. The court now turns to examine the events which underlie plaintiff's complaint.

### A. Operative Events of May 31, 1982

Plaintiff's complaint has its genesis in a disturbance which occurred on May 31, 1982 in SHU at Coxsackie. Plaintiff alleged in his complaint that on this date he was repeatedly struck and kicked by various defendant Correctional Officers while being taken out of his cell. Plaintiff further alleged that the beating he received at the hands of prison authorities was administered without provocation. Defendants asserted in their pre-trial papers that a different course of events occurred on May 31, 1982. They claimed that upon taking plaintiff out of cell for purposes of escorting him to the recreation yard plaintiff turned and, without warning or provocation, struck C.O. Huff in the face and then continued to struggle with the other C.O.s who sought to assist Huff in subduing the plaintiff.

At trial, plaintiff testified and also called fellow inmates Nathan Giles, Carlos Alomar, and Caseem Jacobs as witnesses. The defendants called Sgt. Thomas McKernon, Lt. Daniel Martuscello, C.O. James Huff, C.O. Michael Baldwin, and C.O. Charles Finn as witnesses.

With regard to the excessive force claim, plaintiff testified that on May 31, 1982, he was "called out" of his cell by prison authorities purportedly for the purpose of escorting him to the exercise yard for his daily exercise regimen. Plaintiff claims that he was told to place his hands on his head, to face the back wall of his cell, and to begin backing out of his cell into the hallway. He also testified that he was told by one of the correction officers that if he removed his hands from the back of his head he would be struck by the officers. Richardson testified that upon exiting his cell he was ordered to place his hands on the adjacent wall and to assume the "frisk position." He asserts that upon removing his hands from the back of his head he was immediately struck from behind, was knocked to the floor, and then was subjected to a beating by the various defendants. He claims that he made no aggressive or hostile motions, that he threw no punches and made no kicks during the ensuing moments, and that he merely laid on his back on the ground with his hands and feet above him in an attempt to ward off the various blows administered by the defendant officers. Plaintiff claims that both correction officers and supervisory personnel participated in the altercation.

Plaintiff's version of the events was corroborated by the testimony of his first witness, Carlos Alomar. However, the court finds the testimony of witness Carlos Alomar to be of little validity. Although Alomar professed to have seen plaintiff subjected to blows, kicks, and punches from defendants, it became clear to the court, as established by records, photographs, witness testimony, and plaintiff's own diagram of the SHU housing unit, that Alomar, at the time of the events in issue, was housed in a separate wing of the Special Housing Unit far removed from the altercation which ensued. Consequently, it is clear to the court that this witness could have seen nothing that transpired relevant to the instant disturbance. It is further significant to note that Alomar's testimony closely paralleled the testimony of Giles and Jacobs with respect to how the events transpired thus giving the impression of contrived testimony among the plaintiff's various witnesses.

Nathan Giles testified that he was housed directly across the cell block from the plaintiff and that upon hearing a noise he looked

out the window in his cell door. He testified that he first observed plaintiff on the ground, bleeding from the head, his hands and feet in the air, being kicked and punched by various correction officers. He also stated that a number of blows were inflicted to plaintiff's head.

On cross-examination, however, Giles stated that he could not unequivocally state that plaintiff was struck in the head and conceded that he saw nothing before plaintiff was on the floor. Additionally, Giles stated that did not recall the presence of a supervisory officer and stated that he saw "all blue shirts." [1] He testified that he remembered the presence of C.O. Baldwin, C.O. Fonda, C.O. Huff, and C.O. Finn, but could not identify any specific actions on the part of any of the particular officer with respect to the altercation.

Caseem Jacobs testified that the altercation occurred in front of his cell. He stated that he first heard plaintiff being ordered by a correction officer to take his hands off the back of his head and stick them in his pockets. He further testified that when plaintiff did as he was instructed, a correction officer began kicking, punching, and hitting plaintiff with his baton. Jacobs claimed that the beating took place over the course of five minutes and that plaintiff was knocked unconscious and then placed in a cell. However, that witness testified that he believed it was C.O. Fernandez and C.O. Hurley that assaulted the plaintiff although he could not identify any acts attributable to either officer.

The testimony of the witnesses Giles and Jacobs was cast in serious doubt because of the events that transpired prior to the May 31, 1982 incident at the Coxsackie facility. Testimony was offered by the defendants which shows that there had been five or six previous incidents of assault on staff officers by inmates in the days immediately preceding May 31, 1982, all of which occurred while inmates were being escorted out of SHU for the exercise yard or for other reasons. There was also evidence presented that shows that these isolated attacks were in

retaliation for the death of Inmate Harvey at Great Meadow. Further, the various defendant officers testified that since the practice of unprovoked attacks by the SHU inmates on correction officers was encouraged verbally by the other inmates, a procedure had been instituted approximately two weeks before the May 31, 1982 incident whereby steel flaps, or covers, were placed over the windows in the SHU cell doors. These flaps were "closed" at any time a SHU detainee was being escorted into or out of the cell block. The practice was instituted to block the view of the inmates and avoid encouragement of unruly behavior. While the evidence indicates that this practice was not followed invariably, there is adequate support for defendants' position that the at the time of the events at issue these window flaps were in the "closed" position. Thus, the credible evidence shows that the various SHU detainees at the time of the May 31, 1982 incident, including the inmates called as witnesses by the plaintiff, were unable to view the events at issue. Based upon this, the court discredits much of the testimony provided by plaintiff and his various witnesses.

Defendants' version, not surprisingly, was markedly different than that of plaintiff's witnesses. Defendants' testimony established that on May 31, 1982 at approximately 8:50 a.m. Sgt. McKernon, accompanied by C.O.s Martuscello, Huff, Baldwin, and Finn, went to plaintiff's cell to take him to the exercise yard. McKernon directed the plaintiff to place his hands on the back of his head, back out of his cell, and then assume the "frisk position" on the wall adjacent to the cell door. This was done and plaintiff was frisked by Officer Martuscello without incident. Plaintiff was then told to turn to his right and proceed toward the exercise yard. Plaintiff took two or three steps and then lunged at Officer Huff, punching him in the nose and right eye. Simultaneously, Officer Huff, who was carrying a baton, jabbed the plaintiff in the upper chest and/or throat area with his left hand (which was still on the baton) and then countered with a right cross with the baton to plaintiff's jaw and neck

---

1. The evidence at trial was clear that at the time of the occurrence supervisors wore white uniform shirts, non-supervisory correction officers wore blue.

area. At the same time, C.O. Martuscello struck a hard blow with his baton to the back of plaintiff's legs causing plaintiff to fall to the floor. The guards then piled on the plaintiff and he was handcuffed by McKernon and returned to his cell.

Medical records substantiated an injury to Officer Huff's nose and eye and there was no explanation offered by plaintiff of how that occurred. Thus, the uncontroverted evidence supports defendants' position that Huff was struck in the eye and nose by plaintiff's right fist.

The testimony of the defendants also revealed that within an hour of the incident the facility nurse came to the floor and plaintiff was taken from his cell to an examination area. The nurse found a laceration on the top of plaintiff's scalp and determined that plaintiff's hair had to be shaved in the area of the laceration so that sutures could be placed to close the wound. The suturing occurred in the facility infirmary shortly after noon on the same day. ·

In connection with plaintiff's scalp laceration, the defendants testified uniformly that he was never struck on the top of the head with the baton but that when Officer Huff jabbed and countered with his baton, plaintiff spun around, hit a cell door on the opposite side of the tier, and thus suffered the laceration that was sutured by the institution medical personnel.

Sergeant McKernon also testified that while escorting plaintiff from the facility hospital back to plaintiff's cell, he asked plaintiff why he had struck Officer Huff. McKernon contends that plaintiff stated that he struck officer Huff in retaliation for an incident in which C.O. Perez allegedly assaulted inmate Weston Harrell. Plaintiff purportedly claimed that although he wanted to attack Perez, he could no longer wait for such an opportunity so instead he struck Huff.

Due to various internal inconsistencies in plaintiff's testimony with regard to the events of May 31, 1982, the court finds that the probability of the truth of defendants' version of the events is greater than that put forth by plaintiff. Therefore, the court finds by a preponderance of the evidence that the events of May 31, 1982 occurred substantially as testified to by the defendants.

## B. Superintendent's Hearing

Plaintiff's complaint also stated a claim for alleged deprivations of due process occurring in the Superintendent's Hearing which was held as the result of internal prison disciplinary charges brought against the plaintiff for his alleged participation in the May 31, 1982 altercation. In this regard, a hearing was held on June 4 & 7, 1982 in which evidence was presented accusing the plaintiff of certain disciplinary infractions. Plaintiff testified that during this hearing Officer Van Dusen, the officer overseeing the hearing, refused to allow him to question certain witnesses,[2] that he refused to permit him to be present when the hearing officer questioned those inmates, and that he never informed plaintiff whether any of the inmates were ever called or questioned. Plaintiff acknowledged that it was standard practice in such hearings for the hearing officer himself to question witnesses based upon pre-prepared questions provided by the inmate calling the witness.

Captain Van Dusen testified that in relation to the hearing he interviewed each inmate requested by plaintiff and that he also reviewed written statements provided by each witness. He claimed, however, that he refused to allow the plaintiff to be present during such questioning because of security concerns. In this respect, Van Dusen testified that each witness called by the plaintiff, and the plaintiff himself, were SHU detainees who had either participated in or encouraged unprovoked violence upon the prison staff in the SHU ward in the previous weeks. Van Dusen claimed that he sought to avoid further problems potentially arising when the inmates were brought together.

Following the hearing Capt. Van Dusen imposed three-hundred and sixty (360) days SHU confinement with loss of prison privileges upon plaintiff for his participation in the May 31, 1982 altercation. This finding was later reversed and ordered expunged by

---

2. These witnesses being Nathan Giles, Weston Harrell, Darrell Ray, and Cleophas Jacobs.

a state court in a CPLR Article 78 proceeding held in Wyoming County. No party was able to provide the court with the basis for the state court's disposition of the Article 78 proceeding.

## II. CONCLUSIONS OF LAW

### A. Eighth Amendment Excessive Force

Following the completion of the plaintiff's proof, the court dismissed the excessive force claims as to defendants Finn and Baldwin pursuant to Fed.R.Civ.P. 50 on the grounds that there existed no credible evidence supporting their involvement in the alleged incident. The following constitutes the court's conclusion of law as to the excessive force claim brought against the remaining defendants.

■ The Eighth Amendment protects prisoners from "cruel and unusual punishment." *See Wilson v. Seiter,* —— U.S. ——, ——, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102–05, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976). However, it is "the unnecessary and wanton infliction of pain", *Estelle v. Gamble,* 429 U.S. at 103, 97 S.Ct. at 290, and not simply the "ordinary lack of due care for the prisoner's interests or safety", *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986), which the Eighth Amendment prohibits.

■■ To prevail in this civil rights action grounded in the Eighth Amendment, the plaintiff must show that the defendants used such excessive force to subdue him that the force could fairly be characterized as the "unnecessary and wanton infliction of pain." *See Hendricks v. Coughlin,* 942 F.2d 109, 113 (2nd Cir.1991). What is necessary to establish an "unnecessary and wanton infliction of pain" varies according to the nature of the constitutional violation. *Whitley v. Albers,* 475 U.S. at 320, 106 S.Ct. at 1084. "Wantonness does not have a fixed meaning but must be determined with 'due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged.'" *Wilson v. Seiter,* —— U.S. at ——, 111 S.Ct. at 2326 (quoting *Whitley v. Albers,* 475 U.S. at 320, 106 S.Ct. at 1084). In this manner,

the court must consider the "wantonness" element within the context of the situation in which the underlying force occurred. *Id.* What may amount to the "unreasonable and wanton infliction of pain" is determined by the constraints facing the state official. As the *Whitley* court stated:

> Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Id.* at 321–322, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

■ The Supreme Court has recently reaffirmed use of the *Whitley* test in situations such as the one now before the court. *See Hudson v. McMillian,* —— U.S. ——, ——, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). In *Hudson,* the Court stated that "whenever prison officials stand accused of using excessive force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley:* whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.*

Applying the *Whitley/Hudson* test, the Second Circuit recently stated:

> To determine whether the defendants acted maliciously, a jury should consider the following factors: the extent of the plaintiff's injuries; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response. *Id.* (citing *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085). If an evaluation of these factors leads the jury to conclude that the

defendants acted maliciously, wantonness has been established. And an Eighth Amendment violation has occurred. If, on the other hand, reflection upon these factors leads the jury to find that the defendants acted in a good-faith effort to maintain and restore discipline, no constitutional violation has occurred because the subjective component of the claim has not been satisfied.

*Romano v. Howarth,* 998 F.2d 101 (2d Cir. 1993).

■ Applying these standards, this court finds that the use of force in the instant case was justified in light of the threat posed to the defendants by Mr. Richardson unprovoked actions. Indeed, the court finds that it was well within reason for these officers, faced with the threat of extended violence by the plaintiff, to aggressively attempt to subdue plaintiff. Crediting the officer's allegations that the plaintiff continued to struggle even after he was pinned to the ground, the court finds that it was reasonable for a number of the defendants to join in the melee in an attempt to handcuff the plaintiff. There is no proof that any defendant exerted more force than was reasonably needed in the situation. Consequently, the evidence in the case leads to the compelling conclusion that the force applied against the plaintiff was done so in a good faith effort to restore discipline and not applied wantonly, maliciously, or sadistically. In this regard, the court credits defendants' explanation for the cause of plaintiff's head laceration. That being the situation, the court finds as a matter of law that plaintiff has not proven the essential elements of his claim of excessive force. Accordingly, the court finds in favor of the defendants on this claim.

### B. Eighth Amendment Inadequate Medical Attention

Upon defendants' Fed.R.Civ.P. 50 motion, the court dismissed the Eighth Amendment medical claim upon the grounds that there existed no indication that the defendants acted with deliberate indifference to plaintiff's medical needs. Rather, the evidence showed that plaintiff received adequate and timely medical attention.

### C. Fourteenth Amendment Due Process

Turning to the plaintiff's Fourteenth Amendment denial of due process claim, the court finds, for the reasons discussed below, that plaintiff has failed to establish the necessary elements of claim for a due process deprivation.

■ The Due Process Clause provides inmates with several protective procedures that they may expect at disciplinary hearings, including written notice of the charges against them, the opportunity to appear at the hearing and to call witnesses, a written notice of the fact-finder setting out the evidence relied upon and the reason for any disciplinary action taken, and, for illiterate inmates or in complex cases, the aid of fellow inmates to collect and present evidence. *See Wolff v. McDonnell,* 418 U.S. 539, 564–66, 94 S.Ct. 2963, 2978–79, 41 L.Ed.2d 935 (1974); *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988). These procedures, of course, must in certain circumstances give way to institutional safety or correctional goals. *Young v. Hoffman,* 970 F.2d 1154 (2d Cir.1992) (*per curiam*) (citing *Freeman,* at 953–54). Further, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable. '[A] prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity.'" *Scott v. Kelly,* 962 F.2d 145 (2d Cir.1992) (quoting *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991)).

■ Here, the facts reveal that plaintiff was given an opportunity to call witnesses and to present evidence. Given the penological concerns for prison safety arising from the series of events surrounding the plaintiff and the inmates he sought to call as witnesses, there existed no absolute right for plaintiff to be present when the witnesses were examined or for him to be notified in writing when the witnesses were called. *See Afrika v. Selsky,* 750 F.Supp. 595 (S.D.N.Y.1990). Because no evidence to the contrary was presented to the contrary, the court assumes that a written determination by the hearing

officer was handed down and that, from this determination, it was clear to the plaintiff which witnesses were called and questioned. Thus, from the proof adduced at ·trial the court finds that plaintiff has failed to establish a denial of his constitutionally protected right to due process during the Superintendent's Hearing on June 4 & 7, 1982.

However, the court is troubled by the fact that the determination of the Superintendent's Hearing was latter reversed by a state court judge yet neither party could present the underlying reason for that reversal. Given the temporal distance between this action and the state court's decision it is no surprise that the basis for the decision remains a mystery. But the void leaves the court wondering whether there were facts presented to the state court which were not presented to this court which possibly formed the basis of a finding by the state court that the Superintendent's Hearing lack due process. Of course, this is mere speculation and it is incumbent upon the plaintiff to come forward with facts sufficient to prove his cause of action. He has not done so.

Further, it is clear that a violation of state law or regulation, although perhaps sufficient to warrant reversal of an administrative proceeding, does not necessarily equate with a federal due process violation. *See Gutierrez v. Coughlin*, 841 F.2d 484 (2d Cir.1988); *Afrika v. Selsky*, 750 F.Supp. at 602. Thus, it is quite possible that the state court reversed the hearing examiner on grounds unrelated to plaintiff's instant challenge.

■ Still further, the court finds that *even when assuming* that the Superintendent's Hearing was conducted in manner that deprived plaintiff of his due process rights, the process afforded the plaintiff in the Article 78 proceeding cured any defect in the original hearing. *See Young, supra* (determining that administrative appeals process cures due process deficiency in original disciplinary hearing).

And finally, the court finds that plaintiff realized no liberty denial arising by virtue of the Coxsackie Superintendent's Hearing because he remained in SHU without privileges[3] during the period between the Coxsackie hearing decision and the state Article 78 proceeding pursuant to the then-valid Superintendent's determination from Great Meadow Correctional Facility. Consequently, the determination at Coxsackie to detain plaintiff in SHU to a term coterminous with the term mandated by the Great Meadow detention deprived plaintiff of no liberty right. Thus a question exists whether due process was in fact implicated. *See Id.*, (procedural safeguards are only applicable when " 'there exists a liberty or property interest which has been interfered with by the State.' ") (quoting *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989)); *Benitez v. Wolff*, 985 F.2d 662 (2d Cir.1993) ("When an inmate is charged with a rules violation that could lead to the loss of good-time credits or to confinement in SHU, at least the minimum requirements of procedural due process appropriate for the circumstances must be observed.") Even assuming that it was, the facts are such that plaintiff suffered no cognizable damages proximately caused by the Coxsackie Superintendent's Hearing. Had plaintiff been confined in SHU *solely* as a result of Capt. Van Dusen's order the matter would have been of a different posture. However, that was not the case.

Consequently, the court finds that plaintiff has failed to prove the essential elements of his denial of due process claim and finds in favor of the defendants.

---

3. At trial plaintiff testified that his commissary and mail privileges, which had originally been revoked by the Great Meadow Superintendent's Hearing, had been restored prior to being transferred from Great Meadow to Coxsackie. Plaintiff further contended that these privileges were again revoked by the Coxsackie hearing.

The defendants testified that to restore privileges prior to elapse of the time for which they were originally revoked, an order or directive must be issued. The court has examined the records which were introduced into evidence with respect to this issue and is unable to find any order or directive restoring those privileges. Therefore, the court discredits plaintiff's conclusory allegation that his privileges had been restored prior to arriving at Coxsackie.

## III. CONCLUSION

For the reasons discussed above, the court finds in favor of the defendants on all claims brought against them. Accordingly, it is hereby

**ORDERED** that the complaint is dismissed with privileges and the Clerk of the Court is to enter judgment in favor of the defendants on all claims.

**IT IS SO ORDERED.**