Gary A. WILLIAMS, Plaintiff,

v.

John P. KEANE, Superintendent, Dr. S. Kapoor, Medical Director, Dr. Shapiro, Staff Physician (Podiatrist), and Dr. Dyett, Staff Physician, Defendants.

91 Civ. 6072(JES).

United States District Court, S.D. New York.

Sept. 13, 1996.

Gary A. Williams, Auburn, NY, Pro Se.

Robert Abrams, Attorney General of the State of New York, New York City, Robert F. Bacigalupi, Assistant Attorney General, of counsel, for Defendants.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge:

Pursuant to 42 U.S.C. § 1983, plaintiff Gary A. Williams, appearing *pro se*, brings the above-captioned action against defendants John P. Keane, Superintendent of the Sing Sing Correctional Facility ("Sing Sing"); Dr. S. Kapoor, Sing Sing Medical Director; and Sing Sing staff physicians Drs. Shapiro and Dyett (collectively "defendants"). Williams claims he was deprived of, *inter alia*, his Eighth Amendment right to be free from cruel and unusual punishment when defendants failed to provide him with a specific type of shoe insert to remedy his foot condition. Pursuant to Federal Rule of Civil Procedure 56, plaintiff moves and defendants cross-move for summary judgment. For the reasons that follow, plaintiff's motion is denied, and defendants' motion is granted.

## BACKGROUND

Beginning in 1981 and at all times relevant herein, plaintiff Gary A. Williams was incarcerated at various facilities of the New York State Department of Correctional Services ("DOCS"). During his incarceration, plaintiff sought and received treatment from institutional medical personnel for foot discomfort resulting from fallen arches. Complaint ("Compl.") at 3; Deposition of Gary A. Williams Dated February 4, 1993 ("Williams Dep.") at 5. Plaintiff described this discomfort as a "constant aching in [his] feet" or ankles which is alleviated when he is off his feet. Williams Dep. at 40. Plaintiff's foot condition impairs his ability to play basketball, walk uphill, exercise and withstand cold temperatures for extended periods of time. *Id.* at 5, 11, 14, 24.

Between 1981 and 1983, plaintiff was incarcerated in Auburn Correctional Facility ("Auburn") where he sought further treatment for his feet. Williams Dep. at 5–6. To remedy his pain, the medical staff at Auburn issued plaintiff three to four pairs of foam rubber "Dr. Scholl's" type arch supports. *Id.* at 9–10. Plaintiff found these inserts unsatisfactory because they provided only temporary relief. *Id.* at 12–13.

From 1983 to April 1988, plaintiff was incarcerated at Easton Correctional Facility ("Easton"). At Easton, plaintiff was treated by a staff physician who issued plaintiff a pair of soft-foam orthotic shoe inserts to be worn inside special soft-soled boots. Williams Dep. at 6, 14–15. In addition, plaintiff was provided with a backboard for his bed designed to alleviate his back pain by relieving back and hip pressure. *Id.* at 14. Plaintiff concedes that the backboard "relieved some of the pain," Compl. at 4, but alleges that these orthotics "didn't work." Williams Dep. at 12. Plaintiff was also granted an exception to Easton dress regulations, permitting him to wear sneakers at his job in the print shop to accommodate his foot problem. *Id.* at 14. Easton's policy of allowing plaintiff to wear sneakers instead of boots while working in the print shop also helped alleviate his discomfort. *Id.*

From April 1988 to November 1989, plaintiff was incarcerated at Great Meadows Correctional Facility ("Great Meadows"). Williams Dep. at 8. At Great Meadows, a staff physician issued plaintiff another pair of orthotics. *Id.* at 12. After these orthotics had worn out, in May 1988 the treating physician provided plaintiff with a new pair of leather and metal bilateral orthotics to wear with special boots. *Id.* at 11–12. These orthotics were manufactured and fitted by a company named Orthotics Systems, Inc. located in Glens Falls, New York. *Id.* at 18–20. When plaintiff used these orthotics, his foot "problem disappeared." *Id.* at 6, 15, 17–18.

By about December 1989, plaintiff had worn out these orthotics. Plaintiff's Letter dated February 26, 1991. Great Meadows physicians then referred plaintiff to a hospital for examination of his feet. Williams Dep. at 41. During this visit, the examining physician indicated that surgery could remedy his pain. *Id.* However, after discussing the possibility of surgery with the physician, plaintiff refused to undergo the procedure on

the basis that he "was still kind of young" and that he did not want to suffer any resulting loss of mobility. *Id.*

Thereafter, in late 1989 plaintiff was transferred to Sing Sing where he began to experience pain again. Williams Dep. at 8, 18, 20. Plaintiff was seen by a Sing Sing nurse, who referred him to a Sing Sing physician, who referred plaintiff to Sing Sing podiatrist Dr. Shapiro. *Id.* at 21. On April 2, 1990, Dr. Shapiro treated plaintiff's foot pain with a customized shoe insert constructed by augmenting a leather and cushion orthotic with adhesive cotton padding supporting the arch. *Id.* at 21–25. On May 21 and 22, June 7 and July 2, 1990, plaintiff complained that the orthotics were not satisfactory. *Id.* at 23. Plaintiff alleges that in September and again in November 1990, Dr. Shapiro examined plaintiff and ordered special orthotics which plaintiff never received. *Id.* Plaintiff learned that those orders were not filled because the previous vender, EM Orthotics, had ceased supplying Sing Sing, which was seeking to find a replacement vendor. Plaintiff's Memorandum of Law filed January 6, 1992 (unpaginated) ("Pltff.Mem.") at 7. Thereafter, Dr. Shapiro treated plaintiff on May 13, 1991 and again on June 17, 1991. Williams Dep. at 26.

On September 13, 1990, Williams sent a letter to the Chief Administrator for Medical Services at Sing Sing, copied to defendant Keane, detailing his foot problems and his inability to secure orthotics from EM Orthotics. Pltff. Mem. at 7. Plaintiff requested transfer to Great Meadows, the only facility which provided complete treatment for his foot problem. *Id.* By letter dated October 3, 1990, a DOCS official responded that an appointment was being scheduled to fit Williams with custom orthotics. *Id.* at 8.

On October 11, 1990, Williams filed an Inmate Grievance Complaint alleging that the Sing Sing medical staff had failed to treat his symptoms. Plaintiff requested immediate treatment, or in the alternative, transfer to Great Meadow. Pltff. Mem. at 9.

On January 10, 1991, Superintendent Keane resolved the grievance, noting plaintiff had failed to appear for the shoe fitting scheduled for October 30, 1990, and rescheduling the fitting.[1] Pltff. Mem. at 11. Thereafter, plaintiff was measured on November 9 and December 7, 1990 by Sing Sing orthopedist Dr. S. Sarnochie and issued orthopedic shoes on December 7, 1990. *Id.;* Williams Dep. at 28. On February 6, 1991, plaintiff returned to Dr. Sarnochie to receive inserts for the shoes. Williams Dep. at 29. At that time, plaintiff complained that the shoes and the inserts were a size too large. *Id.* Dr. Sarnochie took back the shoes and inserts which did not fit. *Id.*

On January 31, 1991, Williams filed a second Inmate Grievance Complaint alleging that he had been issued a pair of boots which were too large and lacked the support or corrective features of his previous pair of boots. Pltff.Mem. at 12. Plaintiff sought the immediate issuance of medically prescribed boots with arch supports. *Id.* Thereafter, on February 20, 1991, Superintendent Keane resolved the second grievance, noting that plaintiff's February 6, 1991 appointment had been unsuccessful because plaintiff had failed to wear socks. *Id.* at 13. As a result, Keane scheduled another fitting in order to resolve the problem. *Id.*

On May 13, 1991 and June 17, 1991, Dr. Shapiro again treated plaintiff for foot pain. Williams Dep. at 26. According to plaintiff, Dr. Shapiro failed to provide substitute orthotics or to prescribe any medication for plaintiff's condition. *Id.* In addition, plaintiff alleges that on August 7, 1991, Sing Sing staff physician Dr. Dyett refused plaintiff's request for a special permit for a metal bed to alleviate his back pain. Plaintiff's Notice of Motion filed July 2, 1993 ("Pltff.Not.Mot.") at 2. Plaintiff asserts that Dr. Dyett made this decision based upon an a 1986 X-ray indicating no abnormalities of plaintiff's spine. *Id.*

On September 10, 1991, plaintiff filed the instant Complaint claiming that his rights under the Eighth Amendment had been violated. Plaintiff alleges that defendants' failure to provide him with a specific combina-

---

1. Plaintiff indicates that he did not attend the October 30, 1990 appointment because he had not been informed of the appointment until after the fact. Pltff.Resp. at 10.

tion of arch supports and boots violated his Eighth Amendment rights and forced his family to "take on the burden of providing [his] medical needs at their expense" in May 1991.[2] Plaintiff requests that the Court direct defendants to supply him with arch supports and boots made by Orthotics Systems, Inc. Compl. at 4–5. In addition, plaintiff seeks compensation to his family for their expense in providing him footwear and arch supports from January 1991 until he receives medically prescribed arch supports and boots. Id. at 5. Plaintiff also seeks $250,000 in punitive damages, and court costs.[3] See id.; Plaintiff's Response to First Defense and Answer filed February 25, 1992 (unpaginated) ("Pltff.Resp.") at 5.

Thereafter, on November 4, 1991, plaintiff was transferred to Auburn. Pltff.Resp. at 11. At Auburn in September or October of 1992, plaintiff was fitted with a pair of orthotics and was issued a pair of special "new balance" shoes. Williams Dep. at 37. Plaintiff admits that he is satisfied with these orthotics which improve his condition and alleviate his pain, enabling him to perform his job laminating desks and to stand up to an hour at a time. Id. at 30, 36. Plaintiff asserts that he is receiving regular treatment at Auburn, and as a result "I don't have those, that severe problem anymore." Id. at 32.[4]

## DISCUSSION

■ Summary judgment is appropriate where "there is no genuine issue as to any fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–52, 106 S.Ct. 2505, 2509–12, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the moving party has the burden of demonstrating the absence of any genuine issue of material fact. See Adickes v. Kress & Co., 398 U.S. 144, 157, 90

S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). On the other hand, a party opposing a motion for summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Rather, the party must enumerate "specific facts and circumstances supported by depositions, affidavits based on personal knowledge, and admissions," and cannot rely upon conclusory allegations or denials. General Elec. v. New York State Dep't of Labor, 936 F.2d 1448, 1452 (2d Cir.1991).

■ To succeed in asserting his Eighth Amendment claim, plaintiff must establish that defendants were deliberately indifferent to his serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Deliberate indifference must have both a subjective and an objective component. See Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

■ In this case, however, there is no rational basis for an inference of deliberate indifference. Plaintiff does not even allege that defendants acted in bad faith or that they intentionally deprived him of, or delayed his access to, effective medical treatment, and there is no evidence rationally supporting such a finding. On the contrary, it is clear, and indeed undisputed, that since the beginning of his incarceration in 1981, plaintiff was afforded consistent, attentive medical care on a regular basis in an effort to remedy his foot pain. Thus, plaintiff was provided with, inter alia, four pairs of arch supports at Auburn between 1981 and 1982, Williams Dep. at 6, 10; a pair of soft-foam orthotics to

---

**2.** Plaintiff does not specify in what way his family provided for his medical needs or at what expense.

**3.** Because plaintiff proceeded in forma pauperis, see Order dated September 10, 1991, his request that the Court award him court costs is without merit.

**4.** In his complaint, plaintiff alleged that he has "recently noticed a growth or lump on the bottom of my right foot where the arch should be." Compl. at 5. However, plaintiff later admitted that the growth, described as a callus, has disappeared. Williams Dep. at 38.

use inside special issue soft-soled boots at Easton between 1983 and 1988, *id.* at 6, 14; a special bed backboard at Easton which relieved back and hip pressure, *id.* at 14; leather and metal orthotics at Great Meadow in or about 1988, *id.;* leather and cushion orthotics constructed by a podiatrist at Sing Sing in 1990, *id.* at 26; special boots ordered by an orthopedist at Sing Sing in 1990, *id.* at 26; and "new balance" sneakers specifically designed for plaintiff as well as a pair of orthotics at Auburn. *Id.* at 26, 37. In addition, plaintiff was taken to an outside hospital for consultation and offered the option of surgery to alleviate his symptoms, which he refused.[5] *Id.* at 41.

It is clear that, even given the most generous reading, *see Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has failed to come forward with any evidence supporting a finding of cruel and unusual punishment, establishing that defendants' conduct was "repugnant to the conscience of mankind" or incompatible with the "evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102, 106, 97 S.Ct. at 290, 292 (citations and internal quotations omitted). It follows that defendants are entitled to summary judgment.

 That conclusion is further supported by the fact that plaintiff has no constitutional interest in being treated at a particular facility or by a specific physician. *See Jackson v. Fair,* 846 F.2d 811, 817–18 (1st Cir.1988); *c.f. Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) (the constitution does not contemplate that prisoners receive unfettered access to medical care). Nor is plaintiff's disagreement as to the appropriate course of treatment sufficient to establish an Eighth Amendment claim. *See Dean v. Coughlin,*

804 F.2d 207, 215 (2d Cir.1986); *Layne v. Vinzant,* 657 F.2d 468, 473 (1st Cir.1981); *Arce v. Banks,* 913 F.Supp. 307, 310 (S.D.N.Y.1996); *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992). By claiming that defendants failed to satisfy his request for a specific type of orthotics, plaintiff is at best complaining that he was not given the particular type of shoe he wanted. That Dr. Dyett did not order a recent X-ray prior to denying his request for a special bed permit is in essence a dispute about a medical decision. These are at best malpractice claims which are clearly not sufficient.[6] *See Estelle,* 429 U.S. at 107, 97 S.Ct. at 292 ("medical decision not to order an X-ray, or like measure, does not represent cruel and unusual punishment"); *Harding v. Kuhlmann,* 588 F.Supp. 1315, 1316 (S.D.N.Y.1984), *aff'd,* 762 F.2d 990 (2d Cir.1985).[7]

 The claim that plaintiff had to wait several months before his orthotics were supplied due to administrative delay in securing a vendor likewise do not implicate plaintiff's constitutional rights, especially since plaintiff concedes that a significant portion of the delay in receiving the orthotics was caused by the withdrawal of the prison vendor EM Orthotics and the search for a replacement vendor. *See Bryant v. Maffucci,* 923 F.2d 979, 983–85 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991) (administrative delay in scheduling a medical procedure caused by negligence does not constitute deliberate indifference). Nor were plaintiff's due process rights violated when he was arguably deprived of prompt treatment for his medical complaints. Such delay does not and cannot implicate plaintiff's procedural due process rights where, as here, plaintiff pursued the prison grievance proce-

---

5. Dr. Shapiro's failure to prescribe pain medication does not support a finding of cruel and unusual punishment, especially where, as here, plaintiff does not allege that he requested such medicine.

6. Indeed, plaintiff in his January 31, 1991 Inmate Grievance Complaint describes his complaint as one of "medical negligence." Pltff. Mem. at 12.

7. In addition to experiencing a recurrence of his leg and back pain, plaintiff also began to experience colds and flu-like symptoms. *See* Pltff.Resp. at 6–7. The claim that the treatment provided by Sing Sing's medical personnel—Tylenol, Corinciden, aspirin, cough syrup and nasal spray—were constitutionally deficient is not worthy of serious consideration. *See Estelle,* 429 U.S. at 106, 97 S.Ct. at 292.

dure and received two prompt responses scheduling two orthopedic fittings.[8]

 In any event, even assuming, *arguendo*, a constitutional violation occurred, plaintiff's request for injunctive relief must be rejected as moot since plaintiff has been issued orthotics which he concedes adequately alleviated his pain and discomfort. In addition, plaintiff's request for money damages in connection with defendants' actions taken in their official capacities is barred by the Eleventh Amendment. *See Edelman v. Jordan*, 415 U.S. 651, 663–75, 94 S.Ct. 1347, 1355–62, 39 L.Ed.2d 662 (1974); *Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir.1993).

Furthermore, qualified immunity protects defendants from liability for damages in their individual capacity. Qualified immunity shields government employees from liability for conduct which is objectively reasonable and "does not violate clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citations omitted).

Here, defendants' conduct in attempting to remedy plaintiff's foot discomfort was objectively reasonable. Plaintiff was seen by Dr. Shapiro on at least five different occasions. Moreover, Keane responded promptly to plaintiff's complaints by scheduling appointments to fit orthotics, and both orthotics and special boots were in fact requisitioned and fitted on numerous occasions for plaintiff. As set forth above, plaintiff has not alleged that defendants acted with bad faith. Nor has plaintiff set forth any case even now recognizing a § 1983 claim on similar facts. Indeed, at the relevant time, the law recognized that decisions as to the appropriate course of medical treatment, even if negligent, did not implicate a prisoner's constitutional rights. *See Estelle*, 429 U.S. at 107, 97 S.Ct. at 292. It follows that all defendants are at the very least entitled to qualified immunity.

## CONCLUSION

For the reasons stated above, plaintiff's motion is denied, and defendants' cross-motion is granted. The Clerk of Court is directed to enter judgment accordingly and close the above-captioned action.

**It is SO ORDERED.**

---

**8.** The claims against defendant Dr. S. Kapoor, Sing Sing Medical Director, must also be rejected on the ground that plaintiff has alleged no factual basis affording a rational inference that Dr. Kapoor had any personal involvement in the violation. *See Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986). Indeed, Dr. Kapoor is named only in the caption of the instant complaint.