Mark A. DIXON, Plaintiff,

v.

Commissioner Glenn S. GOORD, Superintendent Christopher Artuz, and Deputy Superintendent George Schneider, Defendants.

No. 01 CIV. 1660(VM).

United States District Court,
S.D. New York.

Oct. 23, 2002.

Mark E. Dixon, Clinton Correctional Facility, Dannemora, NY, pro se.

Lisa M. Fitzgerald, Dennis C. Vacco, Attorney General of State of New York, New City, for defendants.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Mark Dixon ("Dixon"), proceeding *pro se*, brings this action under 42 U.S.C. § 1983 claiming violations of his constitutional rights under the Eighth and Fourteenth Amendments of the United States Constitution. Defendants, the Commissioner of the New York Department of Corrections ("DOCS") and other DOCS officials and corrections officers (collectively, "Defendants"), have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the claims against them. For the reasons set forth below, the Court grants the motion in its entirety.

## I. BACKGROUND [1]

On December 1, 1999, Corrections Officer J. Erns ("Erns") was attacked by inmate Motley ("Motley") at the Green Haven Correctional Facility ("Green Haven"). While Erns was attempting to subdue Motley, two other inmates struck Erns. One inmate was identified by Erns as Williams, but Erns could not identify the third. Corrections Officer M. Dickinson ("Dickinson") claimed to have witnessed the incident and identified Dixon as the third inmate who struck Erns. Dickinson wrote a misbehavior report charging Dixon with violating DOCS Disciplinary Rule 100.11 (Assault on Staff), Rule 106.10 (Refusal to Obey a Direct Order), and Rule 107.10 (Physical Obstruction and Interference).

On December 7, 1999, a Tier III disciplinary hearing on the charges against Dixon began at Green Haven. The hearing ended on December 15, 1999. The Deputy Superintendent of Green Haven, Defendant George Schneider ("Schneider"), presided as the hearing officer.

At Dixon's request, seven witnesses testified at the hearing, four inmates and three prison officers. Another witness, identified by Dixon as a "Latino officer," was not called. Dixon's request to call this additional witness was refused because Schneider did not know who this potential witness was.

At the hearings, Erns testified that he could not identify the inmate who struck him while he was subduing Motley. Later in the hearings, Erns was asked by Schneider whether he had any reason to believe that Dixon was the inmate who struck him. In response to this question, Erns answered "No, sir, I do not." (Dixon Dep. at 68–69.) [2] Dickinson positively

---

**1.** The factual summary that follows derives primarily from Dixon's complaint ("Compl."), Memorandum in Opposition to Summary Judgment ("Pl.'s Mem."), and deposition ("Dixon Dep."), as well as from the Memorandum of Law in Support of Defendants' Motion for Summary Judgment, dated June 14, 2002 ("Def.'s Mem.") and accompanying exhibits and affidavits attached thereto. Except where specifically referenced, no further citation to these sources will be made.

**2.** Dixon's Deposition is attached as Exhibit A to the Affirmation of Michael E. Peeples in

identified Dixon as the inmate who struck Erns.

Schneider found Dixon guilty of all charges and sentenced him to 48 months in the Special Housing Unit ("SHU") and loss of various privileges. DOCS Commissioner, Glenn S. Goord ("Goord"), reduced the sentence to 36 months of SHU and loss of privileges, and the Office of Inmate Discipline ("OID") later affirmed the disciplinary hearing determination, but reduced Dixon's sentence in SHU to 18 months. Dixon then commenced a proceeding in the Supreme Court of the State of New York pursuant to Article 78 of the New York Civil Practice Law and Rules ("CPLR") challenging the determination of guilt on due process grounds. The state court ordered the annulment of the determination of guilt because the tape of the original hearing could not be located and directed a new disciplinary hearing. At the new disciplinary hearing, which took place on November 21, 2000, Dixon was found not guilty. Dixon was then released from SHU and transferred from the Upstate Correctional Facility ("Upstate") to Clinton Correctional Facility.

Dixon alleges that his Fourteenth Amendment due process rights were violated during the course of the disciplinary hearing because (i) Schneider did not locate and call the Latino officer Dixon had requested, (ii) the tape of the hearing was tampered with, obfuscating a statement made by Erns in response to the question as to whether Erns had any reason to believe Dixon was the inmate who struck him, which Dixon alleges is the "apex" of his defense, and (iii) Schneider disregarded Erns's answer to the aforementioned question.

In addition, Dixon alleges that the sentence ordered by Schneider as a result of the Tier III disciplinary hearing, 48 months of SHU and 48 months loss of privileges, was cruel and unusual punishment in violation of the Eighth Amendment.

The remainder of Dixon's claims arise from his alleged mistreatment during his SHU confinement, which Dixon also asserts violated his Eighth Amendment rights. In particular, Dixon alleges that he was (i) cut off from prison population, his computer refurbishing program, daily movement, religious services, legal research, medical showers and personal property, (ii) denied timely legal services and limited access to legal materials, (iii) denied annual teeth cleaning, (iv) subjected to second-hand smoke, (v) given limited food access, which caused him to lose weight, and (vi) packed up and transferred to SHU, resulting in a loss of property. Dixon also alleges that he suffered a physical attack from a cell mate. Dixon contends that all three Defendants are liable on each of the foregoing claims.

In their motion for summary judgment, Defendants allege that Dixon's due process claims cannot withstand summary judgment because (i) Erns's alleged exculpatory answer was not in actuality exculpatory and was, in any event, audible; (ii) regardless of Dixon's tampering claim, a recording of the hearing is not constitutionally mandated; and (iii) Schneider was not required to call a witness that Dixon could not identify. Defendants also allege that Goord and Green Haven Superintendent Christopher Artuz ("Artuz") are entitled to summary judgment on Dixon's due process claims because there is no evidence they had any personal involvement in the alleged constitutional violations.

Support of Defendants' Motion for Summary Judgment, dated June 14, 2002 ("Dixon Dep.").

In addition, Defendants argue that Dixon's Eighth Amendment claims cannot withstand summary judgment because, as a matter of law, the imposition of a disciplinary sentence of 48 months in SHU for the serious offense of assault on a prison official does not constitute cruel and unusual punishment. Furthermore, Defendants argue that Dixon's claims concerning the conditions of his confinement are subject to exhaustion requirements of the Prison Litigation Reform Act of 1986 ("PLRA"), 42 U.S.C. § 1994(e). Alternately, Defendants contend that Dixon's Eighth Amendment claims should be dismissed because there is no evidence that any of the Defendants had any personal involvement in the alleged constitutional violations.

## II. *DISCUSSION*

### A. *SUMMARY JUDGMENT STANDARD*

To grant summary judgment, the court must determine that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, the dispute about a material fact is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248–49, 106 S.Ct. 2505 (citing *Adickes v. SH. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). To defeat the motion, however, the nonmoving party "must do more than simply show that there is some metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). This is particularly true for those issues on which the nonmoving party would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Although the same standards of summary judgment apply when a *pro se* litigant is involved, the *pro se* litigant should be given special latitude in responding to a summary judgment motion. *See McPherson v. Coombe*, 174 F.3d 276, 279 (2d Cir. 1999) (courts "read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.' ")(quoting *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir.1994)).

### B. *DUE PROCESS*

#### 1. *Tampering With the Tape of the Hearing*

Dixon alleges that his due process rights were violated because the audio tape of his disciplinary hearing was tampered with. More specifically, he accuses the Defendants of tampering with the tape in order to obfuscate a particular answer given by Erns that Dixon alleges is the "apex" of his defense. (Compl.¶¶ 26, 27.) Defendants counter that any allegation of tampering is merely conclusory. Furthermore, even assuming that the tape was altered, Defendants argue that the recording was not constitutionally required nor was any alleged omission prejudicial.

In his complaint, Dixon recounts the pivotal question to have been, "Do you think that [Dixon] was the inmate who struck you on that given day?" (Compl.¶ 5.) However, presumably after review of the written transcript of the hearing,[3] Dixon

---

**3.** The transcript is submitted as Exhibit A to the Affidavit of Sandra N. Renihan in Support

of Defendants' Motion for Summary Judgment, dated June 13, 2002 ("Renihan Aff.").

concedes in his memorandum of law that the actual question asked to Erns by Schneider was whether Erns had "any reason to believe that Plaintiff struck you that day." (Pl.'s Mem. at 4.) All parties agree that the answer was, "No sir, I do not." (Def.'s Mem. at 5; Dixon Dep. at 68–69.) Dixon, however, alleges that the tape was intentionally tampered with in order to make the answer inaudible.

◼ In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court set forth the minimum requirements of procedural due process that must be satisfied in prison disciplinary hearings: (i) advance written notice of the charges must be given to the inmate; (ii) the fact finder must prepare a written statement describing the evidence relied upon and the reasons for the determination; and (iii) inmates must be allowed to call witnesses and present documentary evidence at the proceedings.[4] *Id.* at 563–567, 94 S.Ct. 2963.

◼ According to *Wolff,* the only written or audio record of a disciplinary hearing that must be maintained to comply with minimal due process standards is a written statement describing the evidence relied upon and the reasons for the determination. *Id.* at 564–565, 94 S.Ct. 2963. In *Massachusetts Correctional Inst. v. Hill,* 472 U.S. 445, 455–456, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), the Supreme Court noted that its standard in *Wolff* required only consideration of whether there was any evidence in the record that could support the decision reached by the prison

disciplinary board. *See also Gaston v. Coughlin,* 249 F.3d 156, 163 (2d Cir.2001). Therefore, the due process clause requires that a written statement explaining the grounds for the decision be produced and that the decision be based on some evidence in the record.

Here, Dixon does not contest that he was provided with such a written statement setting forth the reasons for Schneider's decision. Furthermore, Dickinson's testimony positively identifying Dixon as the inmate who struck Erns is sufficient to support Schneider's conclusion. Two corrections officers and one inmate also testified that Dixon was in the vicinity of the incident, or could have been in the vicinity, because the gate was not locked. (Renihan Aff. at 19–20, 27, 53–55, 74–75.) Therefore, there is sufficient evidence in the record to support Schneider's decision.[5] The Court therefore agrees with Defendants that any alleged defect in the tape would not rise to the level of a constitutional violation.

◼ While New York law requires that an electronic record of a disciplinary hearing be maintained, 7 N.Y.C.R.R. § 254(b), such a record is not constitutionally required. *See Brito v. Coughlin,* No. 88 Civ. 8064, 1989 WL 241718, at *2 (S.D.N.Y. July 31, 1989) ("[the due process clause] does not require, however, that a transcript be made or given to an inmate after a disciplinary hearing..."). Violations of state law procedural requirements do not alone constitute a deprivation of due pro-

---

4. It is conceded, for the purposes of this discussion, that the approximately ten months Dixon spent in SHU constituted the denial of a liberty interest sufficient to entitle him to the procedural safeguards outlined in *Wolff. See Sandin v. Conner,* 515 U.S. 472, 483, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (the deprivation of a state-created liberty interest does not rise to the level of a constitutional violation unless the punishment imposed

amounts to an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"); *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1999) (question of fact remains as to whether ninety days in SHU is atypical and significant).

5. The record reflects that Schneider relied on this evidence, in particular, the testimony of Dickinson. (Renihan Aff. at 81.)

cess since "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin*, 910 F.2d 75, 78 n. 1 (2d Cir.1990). Dixon does not contest that, at the hearing, the actual question posed to Erns concerning Dixon's possible guilt was clearly heard by Schneider. It is the due process fairness of the hearing itself that is constitutionally significant.

In any event, the response to the question posed to Erns, as Dixon, in his response to summary judgment, has conceded the question was worded, does not appear to the Court to be particularly crucial. Erns admitted at another point during the hearing that he could not identify the inmate who struck him. (Renihan Aff. at 10–12.) Testimony that Erns was not able to identify Dixon as the person who struck him is far different from the statement originally alleged by Dixon in his complaint to have been made by Erns, that Erns did not believe it was Dixon who punched him. (Compl.¶¶ 5, 6.) Therefore, the Court concludes that the omission could not have prejudiced Dixon.

### 2. *Hearing Officer Disregarded Erns's Answer*

■ Dixon also claims that his due process rights were violated because Schneider disregarded Erns's answer. As stated above, the due process clause is satisfied as long as there is any evidence in the record that could support the decision reached by the prison disciplinary board. *Hill*, 472 U.S. at 455–456, 105 S.Ct. 2768. Therefore, there is no constitutional requirement that any particular piece of evidence be relied upon by the hearing officer.

### 3. *Failure to Call a Witness*

■ Dixon next alleges that Schneider's failure to call a witness identified by Dixon as a "Latino officer" violated his due process rights. (Compl.¶¶ 29, 30.) Defen-

dants argue that the uncontested fact that, based on Dixon's description, Schneider was not able to identify the witness was sufficient reason for not calling him to testify at Dixon's disciplinary hearings. In addition, Defendants argue that the Latino officer's testimony would have been duplicative, and therefore unnecessary, because Dixon expected the Latino officer to testify that Dixon was not at the cite of the incident, which other inmate witnesses had already indicated in their testimony.

The Supreme Court held that "an inmate facing disciplinary proceedings should ·be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566, 94 S.Ct. 2963. However, this right is not unrestricted: "Ordinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Id.* Furthermore, the Supreme Court in *Wolff* explained that "[w]e should not be too ready to exercise oversight and put aside the judgment of prison administrators... [w]e must balance the inmates's interest in avoiding loss of good time against the needs of the prison, and some amount of flexibility and accommodation is required." *Id.; see also Scott v. Kelly*, 962 F.2d 145, 147 (2d Cir.1992) (request for witnesses "can be denied on the basis of irrelevance or lack of necessity"); *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir.1991). Emphasizing the caution courts should exercise before challenging disciplinary hearings, the Supreme Court instructs, "[p]rison officials must have the necessary discretion to keep a prison disciplinary hearing within reason-

able limits and . . . to limit access to other inmates to collect statements or to compile other documentary evidence." *Wolff*, 418 U.S. at 566, 94 S.Ct. 2963. Deference to prison administrators may mean upholding a denial of a request even in situations where the "denied witness *might* have provided testimony to exculpate [the inmate]," or where the reviewing court might have ruled differently had it been conducting the hearing. *Afrika v. Selsky*, 750 F.Supp. 595, 601 (S.D.N.Y.1990) (emphasis in original).

The Supreme Court has thus created a flexible, discretionary standard governing a hearing officer's right to limit an inmate's ability to call witnesses at his hearing. The question before this Court is whether the requirements of this flexible standard were met in this case based on the uncontested facts in the record.

Here, Dixon identified and called seven witnesses to testify at his hearing. It is evident from the hearing transcript, (Renihan Aff. at 45–49, 78), that Schneider went to some effort to provide Dixon the opportunity to question the witnesses he could identify. However, Dixon was not able to identify the "Latino officer" by name or to locate the officer himself.

When Dixon first mentioned the Latino officer at the hearing as someone who could testify that Dixon could not have been present during the incident, he described him as a "Latino guy . . . who does transportation . . . he had a light blue shirt on." (*Id.* at 48–49.) In response, Schneider replied: "I don't know who that is. I don't know of any Latinos that do transportation on a steady basis. We have Latino Officers here . . . so it could be one of maybe ten or twelve that we have here." (*Id.* at 4.) Later, Schneider again indicated that he was unable to identify this officer because "there was a large number of officers that responded to that area." (*Id.* at 78.)

Given the vast discretion afforded prison officers and the limited requirements necessitated by *Wolff* to meet due process requirements, Schneider's failure to call a witness identified by Dixon only as "Latino" did not violate Dixon's due process rights. The Supreme Court requires that "prison officials . . . explain, in a limited manner, the reason why witnesses were not allowed to testify" either at the time of the request or later when the decision is challenged. *Ponte v. Real*, 471 U.S. 491, 497, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985); *See also Russell v. Selsky*, 35 F.3d 55, 58 (2d Cir.1994). Schneider has given a logical reason for not providing the witness requested by Dixon, namely that he could not identify the officer based on Dixon's description.

In *Zamakshari v. Dvoskin*, 899 F.Supp. 1097, 1107–1108 (S.D.N.Y.1995), where an inmate requested a gallery list in order to identify other potential witnesses, the court held that the prison officials were not required to produce such a list if it were not available. Similarly, if Schneider was unable to identify the "Latino officer" referred to by Dixon, he was not required to identify and locate the potential witness. *See Amaker v. Coombe*, No. 96 Civ. 1622, 2002 WL 523388, at *10 (S.D.N.Y. March 29, 2002) ("[A]n inmate's right to present documentary evidence in his defense does not entail an obligation on the part of prison officials to retrieve every document that an inmate requests for his case.")

This case can be readily distinguished from *Kingsley*, 937 F.2d at 30–31, where the Second Circuit determined that an inmate's inability to identify potential witnesses did not constitute a waiver of his right to call those witnesses. In *Kingsley*, the alleged violation occurred when an inmate was unable to produce a urine sample during a random drug test. *Id.* at 28. Records were specifically available listing

potential witnesses that could testify to the inmate's nervousness and state of mind. *Id.* at 30–31. Furthermore, because in *Kingsley* the inmate could not identify any of his fellow inmates subjected to the random drug test, he was left with no witnesses at all. *Id.*

In this case, the record demonstrates that Schneider made efforts to secure the testimony of seven witnesses,[6] including one officer, Officer C. Monticello ("Monticello"), who was alleged by Dixon to have been in a similar location as the Latino officer on the day of the incident. (Renihan Aff. at 48.) Furthermore, in this case, the hearing officer did not withhold a readily available list of Latino officers likely to have witnessed Dixon's alleged attack on Erns. Given the nature of a disciplinary hearing, there is a real limit to how much time and effort a hearing officer must exert to satisfy the requirements of due process. *Wolff,* 418 U.S. at 566, 94 S.Ct. 2963. In fact, the Second Circuit in *Kingsley* explicitly limited its holding to the facts of that case:

> Though prison officials can normally insist that a prisoner identify the names of his prospective witnesses, it was arbitrary to insist on this requirement here where the need for the witnesses was especially compelling, their identities were readily available to the prison officials and Kingsley's inability to identify them by name was understandable in view of his arrival at the prison only five days earlier.

937 F.2d at 31. Therefore, Schneider's refusal was reasonable, not arbitrary, and thus conformed with the requirements of due process.

The right to call witnesses would admittedly not be meaningful if prison officers made no attempt to locate or identify witnesses that were requested. New York State law requires a "meaningful effort" to locate witnesses. *Rodriguez v. Coughlin,* 143 Misc.2d 876, 542 N.Y.S.2d 476, 477–478 (N.Y.Sup.Ct.1989) ("Under these circumstances, the Hearing Officer should have made a meaningful effort to secure the testimony of the witnesses requested by the petitioner.") However, in the cases cited by Dixon, the inmate provided the cell block information and/or nickname of the potential witnesses to facilitate locating the witness; and therefore, the state courts found that prison officers were required to have made at least some effort to locate the potential witnesses when "it should be relatively easy to locate the witness requested and not unduly burdensome on the administration." *People Ex. Rel. Cooper v. Smith,* 115 Misc.2d 689, 454 N.Y.S.2d 635, 636–637 (N.Y.Sup.Ct.1982); *see also Rodriguez,* 542 N.Y.S.2d at 477–478. In fact, the *Cooper* court explained: "We agree with the respondent to the extent that if a requested witness is not described with sufficient particularity to locate him or her with reasonable facility, they should not be required to locate that witness." 454 N.Y.S.2d at 636.

The request made by Dixon to locate a sparsely identified officer as "Latino" is not a reasonable request that requires prison officers to act. Locating such a

---

**6.** Though Monticello was not available at some point during the hearing, Schneider made sure he would be called to testify upon his return: "We're going to call Monticello. He's just not available today, okay? Hopefully, he'll be returning tomorrow. If not, I will make an attempt to reach him at his home and put him on the speaker phone. I'd rather have him in person, but ..." (Renihan Aff. at 48, 71–72.); *compare Fox v. Coughlin,* 893 F.2d 475, 477–478 (2d Cir.1990) (defendant who failed to call requested officer because he was away from the prison that day was held not to be personally liable on qualified immunity grounds, but in the future such a failure would be considered a constitutional violation).

witness under these circumstances does not rise to the level of a constitutional requirement, nor would it likely rise to the level of a State law requirement.

## C. EIGHTH AMENDMENT

The Court now turns to Dixon's claims that his sentence and the conditions of his imprisonment while in the SHU violated his Eighth Amendment right to be free from cruel and unusual punishment.

### 1. Sentencing

Dixon alleges that the sentence issued by Schneider was cruel and unusual punishment because it was excessive. Defendants argue that Dixon's allegations cannot withstand summary judgment. The Court agrees for two reasons. First, the punishment complained of by Dixon in his complaint was not actually experienced by him. In scrutinizing the challenged condition, a court is "under an obligation to examine the *actual effect* of challenged conditions upon the well-being of the prisoners." *Rhodes v. Chapman*, 452 U.S. at 367, 101 S.Ct. 2392 (concurring opinion of Brennan, Blackman and Stevens, JJ.) (emphasis in original); *cf. Scott v. Albury*, 156 F.3d 283, 286 (2d Cir.1998) (no right to due process is implicated in the prison context unless the actual punishment imposed, and not the potential punishment, constitutes the deprivation of a liberty interest). Regardless of the 48–month sentence Schneider originally imposed, that sentence was subsequently reduced by Goord to 36 months and by the OID to 18 months. In actuality, Dixon was in SHU for only approximately ten months.[7] (Dixon Dep. at 101)

■ Second, "[r]estraints on an inmate do not violate the amendment unless they are totally without penological justifica-tion,' 'grossly disproportionate,' or 'involve the unnecessary and wanton infliction of pain.' " *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir.1984) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). An inmate's punishment of ten months in the SHU upon being found guilty of assaulting a prison officer by a disciplinary hearing is penologically justified and not grossly disproportionate; a physical assault of a prison official is an extremely serious offense. *See Sostre v. McGinnis*, 442 F.2d 178, 190–194 and n. 28 (2d Cir.1971) (length of disciplinary detention did not constitute disproportionate punishment considering the gravity of the offense). Therefore, Dixon's disciplinary sentence did not in and of itself violate his constitutional rights.

### 2. Normal Incidents of Confinement

■ Dixon's claims asserting that the normal incidents of his transfer to a special housing unit violated his Eighth Amendment rights fail as a matter of law. The conditions of special housing units do not per se constitute cruel and unusual punishment in violation of the Eighth Amendment. *Anderson v. Coughlin*, 757 F.2d 33 (2d Cir.1985). Prisons are permitted to transfer prisoners to institutions with less favorable conditions without constitutional constraint. *Meachum v. Fano*, 427 U.S. 215, 216, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Justice v. Coughlin*, 941 F.Supp. 1312 at 1326. Dixon's allegations of having been cut off from the prison population, a computer program, religious services, legal research, medical showers and personal property, as well as limits on food access, and other normal incidents of SHU confinement, are not violations of the Eighth Amendment. There-

---

**7.** Dixon's reduced sentence was later suspended when Dixon successfully filed a CPLR Article 78 proceeding annulling the prior hearing and was found not guilty at the subsequent disciplinary hearing. (Dixon Aff. Ex. A–6, A–14.)

fore, Dixon's complaints concerning prison conditions that cannot be distinguished from regular incidents of SHU confinement are dismissed on the merits.

### 3. *PLRA Exhaustion Requirement*

■ All complaints concerning conditions of confinement are subject to the PLRA exhaustion requirement. Defendants argue that Dixon's Eighth Amendment claims are barred by failure to satisfy the PLRA requirement to exhaust administrative remedies.

The PLRA states that "[n]o action shall be brought with respect to prison conditions under § 1983 ... or any other Federal law, by a prisoner confined to any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "In enacting 42 U.S.C. § 1997e(a), Congress made exhaustion mandatory... [a]s a result, where an inmate fails to satisfy the exhaustion requirements, the complaint must be dismissed." *Laureano v. Pataki*, No. 99 Civ. 1067, 2000 WL 1458807 at * 1 (S.D.N.Y. Sept. 29, 2000) (citations omitted). The PLRA exhaustion requirement applies to prison conditions concerning circumstances that "affect everyone in the prison community—for example, food, clothing housing, recreational facilities, that is, those things inmates of a prison share in common" *Neal v. Goord*, 267 F.3d 116, 117 (2d Cir.2001). The PLRA requires exhaustion of available administrative remedies for prison conditions even if monetary damages are not available administratively. *Booth v. Churner*, 532 U.S. 731, 740–741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

In New York, the relevant administrative procedure is the Inmate Grievance Program. *See* N.Y. Correction Law § 139 (McKinney 1987); *Matter of Patterson v. Smith*, 53 N.Y.2d 98, 101–102, 440 N.Y.S.2d 600, 423 N.E.2d 23 (1981). New York inmates can file internal grievances with the Inmate Grievance Review Committee ("IGRC"). When an inmate grievance is denied by the IGRC, the inmate may appeal to the superintendent of the facility and then may appeal from the superintendent's determination to the Central Office Review Committee ("CORC"). 7 N.Y.C.R.R. § 701.7.

■ Dixon's argument that the exhaustion requirement does not pertain to his claims because the internal grievance process does not provide for monetary damages has been rejected by the Supreme Court in *Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citing *Booth v. Churner*, 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). Dixon's alternate argument that *Nussle* does not apply because his complaint was submitted before the decision was issued, is similarly unavailing. It is well-settled that when a rule of federal law is established by the Supreme Court, that rule is controlling and must be given full retroactive effect in all pending cases. *See Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 90, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993).

The exhaustion requirement applies, however, only where a remedy is available in the administrative proceedings. *Marvin v. Goord*, 255 F.3d 40, 43 (2d Cir.2001)(citing *Howell v. I.N.S.*, 72 F.3d 288, 291 (2d Cir.1995)). The exhaustion requirement is satisfied by resolution of the matter, i.e., an inmate is not required to continue to complain after his grievances have been addressed. *See Marvin*, 255 F.3d at 43 n. 3; *see also Booth*, 532 U.S. at 736 n. 4, 121 S.Ct. 1819 ("Without the possibility of some relief, the administrative officers would presumably have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust.")

Here, Dixon asserts that his complaints were eventually addressed, through the grievance system, or otherwise, albeit in an untimely manner.[8] (Pl.'s Mem. at 6; Dixon Aff. Ex. B.) Dixon explains that: "The grievances, were usually resolved with untimely action, and in the case of the secondhand smoke, the plaintiff was moved to a non-smoking cell." (Pl's Mem. at 6.) Based on Dixon's submissions, it is not clear whether all his grievances were resolved or, if not, which grievances were not resolved. For any grievances that were not resolved, the PLRA exhaustion requirement pertains, and any such grievances asserted here would have to be dismissed for failure to exhaust.

With regard to Dixon's claim concerning a physical attack he suffered, the Supreme Court has recently declared, reversing the Second Circuit opinion in *Nussle v. Willette*, 224 F.3d 95, 106 (2d Cir.2000), that claims of every sort relating to conditions and occurrences of prison life—including individual claims of assault or excessive force—must be exhausted before an action can be commenced in this Court pursuant to 42 U.S.C. § 1983. *Porter*, 534 U.S. 516, 122 S.Ct. at 986–989, 152 L.Ed.2d 12; *see also Lawrence v. Goord*, 238 F.3d 182, 185 (2d Cir.2001) (retaliation claims need not be exhausted), *vacated*, —— U.S. ——, 122 S.Ct. 1200, 152 L.Ed.2d 139 (2002). Therefore, Dixon must exhaust through the internal grievance system his claim concerning a physical attack he allegedly suffered while in confinement.

Here, there is no evidence that Dixon filed a grievance report concerning the physical attack he allegedly suffered on August 14, 2000. (Bellamy Aff. ¶¶ 10, 11.)

Rather, the only grievance report filed by Dixon referring to the incident of the physical attack requests that he be moved to a higher level cell, specifically with a non-smoker, after presumably being moved in response to the fight with his cell-mate. Dixon made no complaints against any officers for failure to prevent the incident. (Dixon Aff. Ex. B.) This grievance report did not exhaust administrative remedies. *See Booth* 532 U.S. at 740–741, 121 S.Ct. 1819 (as long as a grievance tribunal has authority to take some responsive action, the PLRA requires administrative exhaustion before a § 1983 claim can be filed). Therefore, Dixon's complaint concerning the physical attack, as well as all other complaints not addressed through the grievance system, or otherwise, must be dismissed without prejudice for failure to exhaust.

■ With respect to grievances that were resolved, Defendants' indication that CORC's records demonstrate that Dixon failed to submit any such appeal, (Bellamy Aff. ¶¶ 10, 11, and Ex. C, D), is not relevant. If a grievance has been satisfied, a review board would not have the power to act upon the complaint; therefore, Dixon need not have exhausted the administrative process for complaints he concedes were already redressed.

Similarly, Dixon cannot recover for grievances that were redressed by the internal grievance process. The PLRA was intended to reduce the number of claims brought to federal court by forcing prisoners to seek redress in internal grievance procedures. The legislative history indicates that the purposes behind the PLRA

8. Dixon's record of grievances and letters filed, provided in Dixon's Affidavit in Support of Summary Judgment, at Ex. B, demonstrates a record of complaints that were decided in Dixon's favor with regard to exposure to second-hand smoke, access to a notary and access to his property. The Court notes that Dixon's requests for a particular type of soap to treat his eczema were denied, but since Dixon does not include this grievance in his complaint, it is not considered by this Court to be relevant here.

were to reduce what were perceived as frivolous prisoner petitions as well as the caseload of the federal courts. *See, e.g.,* 141 Cong. Rec. § 7498–01, § 7526 (1995) (statement of Senator Kyl that overall purpose of PLRA is to deter and reduce the numbers of "frivolous inmate lawsuits ... clogging the courts and draining precious judicial resources")(quoted in *Diezcabeza v. Lynch,* 75 F.Supp.2d 250, 255 (S.D.N.Y. 1999)). Allowing Dixon to bring his claims here after they were already redressed internally, would negate the purpose of the PLRA and would be unnecessarily duplicative.

Accordingly, Dixon's claims are reduced to damages for injuries suffered before his grievances were addressed. According to the record, Dixon filed grievances concerning repeated exposure to second-hand smoke for being housed with a smoking cell-mate, untimely provision of notary services, denial of medical attention, and denial of access to his property. (Dixon Aff. Ex. B). Defendants have not alleged that these Eighth Amendments claims are insufficient as a matter of law and they will therefore not be addressed on the merits.[9]

### 4. *Personal Involvement by Defendants*

The Defendants also argue that Dixon's Eighth Amendment claims should be dismissed because there is no evidence that any of the Defendants were personally involved in the alleged violations.

 It is clearly settled that "[i]n order to establish a violation of his Eighth Amendment rights, an inmate must show (1) a deprivation that 'is objectively, sufficiently serious' that he was denied 'the minimal civilized measure of life's necessities,' and (2) a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate indifference to inmate health or safety." *Gaston v. Coughlin,* 249 F.3d at 164 (quoting *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811, (1994)). A prison official may be found to have had a sufficiently culpable state of mind only if he (i) participated directly in the alleged event, (ii) learned of the inmate's complaint and failed to remedy it, (iii) created or permitted a policy that harmed the inmate, or (iv) acted with gross negligence in managing

---

9. While not addressing the merits of these Eight Amendment claims, the Court notes that Eighth Amendment requires prisons to "ensure that inmates receive adequate food, clothing, shelter and medical care, and ... 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)(quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). In order to prevail on an Eight Amendment claim, an inmate must demonstrate that officials acted with "deliberate indifference to one of these basic human needs." *Justice v. Coughlin,* 941 F.Supp. 1312, 1325 (N.D.N.Y.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (Eight Amendment claim requires proof of both subjective elements). Furthermore, in a complaint concerning medical care, the inmate must show that the condition "may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990)) (Pratt J., dissenting). Therefore, Dixon would be hard-pressed to demonstrate that the delays he experienced in having his complaints addressed and ultimately satisfied meet the high standards for constituting cruel and unusual punishment. *See Bryant v. Maffucci,* 923 F.2d 979, 983–85 (2d Cir.1991) (administrative delay in scheduling a medical procedure caused by negligence does not constitute deliberate indifference); *Williams v. Keane,* 940 F.Supp. 566, 571–572 (S.D.N.Y.1996) (delay in medical treatment does not and cannot implicate plaintiff's procedural due process rights where, as here, plaintiff pursued the prison grievance procedure and received two prompt responses scheduling two orthopedic fittings).

subordinates. *Gaston,* 249 F.3d at 164; *see also Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986); *Johnson v. Newburgh,* 239 F.3d 246, 254 (2d Cir.2001); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Personal liability cannot be imposed on a state official under a theory of respondeat superior. *Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999).

█ Here, the Defendants did not work at the facility at which Dixon suffered the alleged unconstitutional conditions he lists in his complaint.[10] Dixon does not assert in his complaint, nor is there any evidence in the record, that Defendants were aware of these conditions or that they were responsible for addressing these conditions. Without knowledge of or responsibility for the conditions, Defendants cannot be held personally liable for alleged violations of the Eighth Amendment. *See Gaston* 249 F.3d at 166 (summary judgment is appropriate where prison guards were not assigned to the facility in which alleged conditions occurred, and where plaintiff does not assert knowledge of the conditions).

The only specific allegation that Dixon makes concerning the Defendants' culpability for the conditions of his SHU confinement is that, by reason of the sentence Schneider issued at the disciplinary hearings, he was made to suffer an unconstitutional sentence and unconstitutional prison conditions. (Compl.¶ 32, 33.) As discussed above, the sentence issued by Schneider did not itself constitute a violation of Dixon's Eighth Amendment rights,

nor are conditions of more secure prison facilities per se unconstitutional. Dixon also states that the Defendants "were grossly negligent in managing subordinates who caused the incident." (Pl.'s Mem. at 13.) Again, however, Dixon refers to the Defendants actions at the time of the hearing at Green Haven and not to their culpability for the conditions at Upstate: "Meaning, if Defendant Goord would have trained his employees efficiently, the Plaintiff would not have endured the specific conditions pertaining to his SHU sentence."[11] (Id.) The Defendants are not responsible for the conditions at SHU because of any alleged impropriety at the hearing. Therefore, Dixon's Eighth Amendment claims must be dismissed because the facts and allegations do not support the requisite personal involvement by Defendants in the prison conditions Dixon alleges constituted the violations.

### III. *ORDER*

For the reasons stated above, it is hereby

ORDERED that Defendants' motion for summary judgment is granted.

The Clerk of Court is directed to close this case.

SO ORDERED.

█

10. Defendants Schneider and Artuz worked at Green Haven, and Goord is Commissioner of DOCS. None of Dixon's grievances concerning prison conditions were filed with DOCS. (Bellamy Aff. ¶¶ 11, 12.)

11. The Court understands this statement by Dixon to mean that if Goord had properly trained his employees, the hearing would have been conducted properly and Dixon's sentence would have been proper. Thereby, Dixon would not have had to endure the conditions of SHU confinement, both the normal incidents of SHU confinement listed in his complaint and the abuses he suffered.